UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
NO. 15-CR-35(2) (RHK/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MOTION TO MODIFY |
| | ) | RELEASE CONDITIONS |
| ALAGIE BARROW, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Alagie Barrow moves to modify the release conditions set by the Court by Order dated February 4, 2015, Doc. No. 8, to permit him to rejoin his family and access the internet. In particular, Mr. Barrow requests the following modifications:

a. The condition requiring that Mr. Barrow reside in a halfway house should be modified to permit him to live with his family in Nashville, Tennessee;

b. The condition prohibiting use of the internet should be removed;

c. The condition preventing Mr. Barrow from having any contact, "directly or indirectly," with witnesses or "any person involved in the alleged offense," including his codefendants, should be modified to permit such contact when made in the presence of counsel;

d. The condition subjecting Mr. Barrow to home detention should be removed and replaced with a reasonable curfew.

In support of this motion, Mr. Barrow states as follows:

1. On February 4, 2015, Magistrate Judge Rau conducted a detention hearing in this matter. After reviewing the Pretrial Services Report and listening to the arguments of counsel,

over the government's objection, the Court ordered Mr. Barrow released subject to stringent conditions.

2.	Mr. Barrow was released a few days later, as soon as a bed became available in a local halfway house. For the last two months, Mr. Barrow has been living in a halfway house in St. Paul, coming and going as necessary to meet with counsel. Mr. Barrow has complied with all conditions of release to date.

3.	As Magistrate Judge Rau found, Mr. Barrow is neither a risk of flight nor a danger to the community. Mr. Barrow is a 42-year-old man with absolutely no criminal record. He immigrated to the United States nearly 20 years ago in 1996, and he has lived in this country ever since. He applied for political asylum as a result of his fear of persecution from the Jammeh regime in The Gambia, which was granted in 1997. In 2004, Mr. Barrow became a U.S. citizen.

4.	Mr. Barrow joined the Army National Guard in 2001 in order to serve his adopted nation. He served in the military, both full-time and on reserve status until 2013. During that time, he completed Officer Training School, rising to the rank of First Lieutenant.

5.	While in the military, Mr. Barrow also completed his education. He graduated from Tennessee State University in 2005 with a degree in criminal justice. In 2012, he earned a master's degree in national security studies.

6.	Mr. Barrow married his wife, Fatou Matta, in 2005. Together they have one son who is seven. Mr. Barrow has two other children from other relationships. All three of his children live in Nashville, and until his arrest in this case, he saw them regularly. Mr. Barrow has lived in Nashville for nearly twenty years.

7.	Mr. Barrow is charged with conspiring to overthrow the Gambian government, in violation of the Neutrality Act, 18 U.S.C. § 960. Although this offense is a serious one, there is

no question that Mr. Barrow allegedly acted out of a strong sense of conscience. The Gambia is ruled by Yahya Jammeh, who has held power since 1994. He is a ruthless, vicious dictator, akin to Idi Amin. The Gambian expatriate community has shown great support for the defendants in this case, for they know that had the alleged plot succeeded, the world would have been a better place. Whatever one's personal opinion about the charges at issue here, it is clear that the defendants allegedly acted selflessly, at great personal sacrifice, in an effort to rid their homeland of an abusive despot.

8. The Bail Reform Act, 18 U.S.C. § 3142, directs the Court, with respect to defendants like Mr. Barrow, who are neither a risk of flight nor a danger to the community, to release them subject to "the least restrictive . . . combination of conditions" that will reasonably assure the appearance of the defendant as required and the safety of the community. Measured against this standard, none of the conditions of release that Mr. Barrow asks this Court to modify are necessary to assure his appearance or the safety of the community.

9. First, Mr. Barrow requests permission to reside with his wife and family in Nashville, Tennessee. Mr. Barrow's codefendant, Banka Mannah, was recently permitted to live with his family in Atlanta, Georgia. There is no basis for the release conditions for Mr. Barrow to be more onerous than those applicable to his codefendant. Mr. Barrow does not pose a risk of flight. He is a U.S. citizen, and for him to flee to The Gambia would be an act of suicide.

10. Second, Mr. Barrow seeks elimination of the prohibition against internet access. Although the Court apparently intended to impose this condition, the Order states only that he seek employment "without computer access subject to Pretrial Services approval of the waiver regarding computer access." Doc. No. 8. There is no reason for a restriction on internet access in this case. Restrictions on internet access have become increasingly common in this district in

every case in which the internet played some role. In this case, the government alleges that the coconspirators contacted each other by email. Even if this is true, that is an insufficient basis to restrict internet access. There is no evidence (let alone clear and convincing evidence) that the defendant would make another coup attempt if only he could access the internet. It is complete happenstance that the defendants allegedly communicated by email rather than telephone.

Moreover, the problem with this routine condition of release is that the internet is so ubiquitous that a restriction on its use poses a significant burden on defendants. In order to enforce this restriction, Pretrial Services requires that the defendant have no devices with internet capability at his work or home. This means that neither he nor his wife may have a smart phone, no one in the family can have a computer or stream movies or television shows, and his son cannot have an Xbox. As a practical matter, this prevents Mr. Barrow and his wife from contacting their relatives in The Gambia by Skype or email. It also means that Mr. Barrow is unable to obtain anything but the most menial job, since any employment within his area of expertise would involve internet access. In addition, Mr. Barrow's son uses the internet for his school work.

11.     Again, consideration of codefendant Manneh's release conditions establish that a prohibition against internet access is unnecessary. When Mr. Manneh returned to Georgia, his Pretrial Services Officer there gave him permission to access the internet. The same should be true of Mr. Barrow.

12.     The conditions of release require that Mr. Barrow have "no contact, directly or indirectly, with any person who is or may be a victim of witness in the investigation or prosecution, including any person involved in the alleged offense." Doc. No. 8 at ¶ 7g. This provision is grossly overbroad and, if taken literally, would prohibit contacts by defense counsel

or investigators with potential witnesses (since they would be considered indirect contacts on behalf of Mr. Barrow).

13. From a legal standpoint, this condition restricts the ability of defense counsel to meet jointly with their clients as part of a joint defense agreement.

14. More troubling, there is nothing about this case that warrants this restriction. The condition prohibiting contact with witnesses and codefendants has become standard in this district, imposed as so much boilerplate. Yet, the Eighth Circuit has long ago held that any restriction on association as a condition of release, because it implicates constitutional interests, "should be limited to only that necessary to assure "the purposes of the bail statute." *United States v. Spilotro*, 786 F. 2d 808, 817 (8th Cir. 1986) (remanding because district court failed to make any findings supporting need for association restriction in that case); *see United States v. Arzberger*, 592 F. Supp. 2d 590 (S.D.N.Y. 2008) (finding Adam Walsh amendments that require certain release conditions, including association restrictions, in every child pornography case unconstitutional because they do not allow "an individualized determination of the need for a no-contact order" to permit the Court to make a "particularized determination of the danger posed by the defendant").

15. In this case, the government has failed to establish any particularized basis for a no-contact order, and Magistrate Judge Rau gave no explanation for why that condition is required. At a minimum, this Court should modify this condition to permit contact with witnesses or codefendants in the presence of defense counsel.

16. Finally, Mr. Barrow has proven over the last two months that home detention is not necessary, particularly in light of the requirement that he submit to GPS monitoring, which makes his exact location known 24 hours a day. Home detention adds nothing to ensure his

appearance. We request that this condition be modified to require a daily curfew from 11 p.m to 6 a.m., except as necessary for employment.

## CONCLUSION

For the foregoing reasons, this Court should modify Mr. Barrow's release conditions.

Dated:  April 6, 2015

*Respectfully* submitted,

s/  Robert D. Richman
ROBERT D. RICHMAN
Attorney ID No. 226142
P.O. Box 16643
St. Louis Park, MN  55416
651-278-4987
Attorney for Defendant