UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-35 (RHK/HB)

| | |
|---|---|
| UNITED STATES OF AMERICA, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ALAGIE BARROW, )<br>)<br>Defendant. ) | GOVERNMENT'S POSITION<br>WITH RESPECT TO SENTENCING |

The United States of America, by and through its attorneys Andrew M. Luger, United States Attorney for the District of Minnesota, Assistant United States Attorney Charles J. Kovats, Jr., and Department of Justice Trial Attorney Richard S. Scott hereby submits its position with respect to sentencing of Defendant Alagie Barrow ("Barrow" or "defendant").

**I.   BACKGROUND ON THE GAMBIA**

At Common Appendix I, the government presents a factual background on The Gambia that is relevant to the sentencing proceedings against Barrow as well as the following defendants:

> *United States v. Papa Faal*, 15-CR-28 (RHK)
> *United States v. Bankeh Manneh*, 15-CR-35 (RHK/HB)
> *United States v. Cherno Njie*, 15-CR-35 (RHK/HB)

**II.  BACKGROUND ON THE OFFENSE CONDUCT**

At Common Appendix II, the government submits an overview of the description of the offenses, defendants, and facts and circumstances describing the conduct at issue. Like Common Appendix I, Common Appendix II is an identical document submitted in

1

each case described above. The specific conduct of the defendant is set forth in more detail in Section III.B below.

### III. THE CASE AGAINST THE DEFENDANT, ALAGIE BARROW

#### A. The Charges of Conviction

On May 11, 2015, defendant Barrow pleaded guilty to Counts One and Two of the Superseding Indictment. Count One charges the defendant with conspiring to participate in an expedition against a friendly nation, in violation of the Neutrality Act (18 U.S.C. § 960), all in violation of Title 18 U.S.C. § 371. Count Two charges the defendant with conspiracy to use a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(o). Taken together, these offenses carry a statutory maximum sentence of 25 years' imprisonment, a maximum term of supervised release of five years, a $500,000 fine, and a $200 mandatory special assessment.

#### B. The Defendant's Offense Conduct

In the plea agreement, defendant Barrow admitted the following facts:

Beginning in or before October 2013 and continuing through December 2014, the defendant, a resident of Tennessee, joined a group of men who intended to change the leadership in The Gambia, a sovereign nation with which the United States is and was at all relevant times at peace. The defendant also knew the group intended to effect this change in leadership through an attempted coup.

<u>Planning</u>

While a member of the conspiracy, the defendant participated in the development of a plan designed to accomplish this goal. In fact, the defendant was a member of a

planning team with several co-conspirators. Among other tasks, the planning team was to provide the group an "Operations Plan" or "Operations Order" that described the means by which the coup would be resourced and executed. Second, the planning team was to identify the equipment and other logistical support required to support the coup.

The defendant, as a member of the planning team, participated in numerous conversations with co-conspirators to further the development of the Operations Order. Although many of these conversations occurred remotely (i.e. through conference calls and by e-mail), the defendant also traveled to Atlanta, Georgia, where he met with co-conspirators in furtherance of the conspiracy, and to Austin, Texas, where he met with another co-conspirator (co-conspirator "A")[1]. On at least several occasions in 2013 and 2014, co-conspirator A paid the defendant money to plan, to purchase firearms and other equipment, and to execute the coup. Below is a spreadsheet detailing payments made by co-conspirator A in furtherance of the conspiracy:

---

[1] Co-conspirator A is defendant Cherno Njie.

| | | | | |
|---|---|---|---|---|
| 8/11/2014 | | Partial Remittance | | |
| Basic Essentials | $ 48,659.00 | Barrow - sustainance | $19,000.00 | |
| Weapons | $ 34,980.00 | Jagne - sustainance | $8,000.00 | |
| Ammo | $ 4,559.00 | Sanneh - sustainance | $8,000.00 | |
| Initiators ECM | $ 5,000.00 | Jagne - Emergency | $5,000.00 | |
| Storage | $ 600.00 | Sanneh - Rent | $2,000.00 | |
| .50 Cal | $ 8,000.00 | .50 Cal - Mcbrides | $18,946.89 | |
| Contingency Advance | $ 1,000.00 | .50 Cal - Mcbrides | $4,000.00 | |
| | $ 102,798.00 | Sanneh - ▮▮▮▮ | $600.00 | |
| | | Barrow - Trial Run | $3,200.00 | |
| | | Barrow - Trial Run | $1,881.00 | |
| Total Budget | $220,798.00 | Jagne - Trial Run | $3,200.00 | |
| Amount Remitted - AB | $ 51,400.00 | 8/11/2014 Sanneh - sustainance, etc | $38,000.00 | |
| Amount Remitted - NJ | $ 51,400.00 | 8/11/2014 Sanneh - Passport fees | $210.00 | |
| Total Remitted | $ 102,800.00 | Barrow/Jagne | $ 102,800.00 | |
| Balance Due | $117,998.00 | Barrow - Vehicle | $10,000.00 | |
| | | Sub-total | $224,837.89 | |
| | | Sanneh - travel | $1,889.51 | |
| | | Faal - travel | $1,298.00 | |
| | | Jagne - Travel to Austin | $651.20 | 10/24/2014 |
| | | Barrow - Travel to Austin | $473.50 | 7/2/2014 |
| | | Sanneh - Travel to Austin | $487.20 | 7/22/2014 |
| | | Barrow - Travel to Austin | $543.70 | 10/24/2014 |
| | | Sanneh to Austin | $500.20 | 10/24/2014 |
| | | Ceesay | $1,919.00 | |
| | | Jagne | $2,031.39 | |
| | | Lowe | $1,107.85 | |
| | | Faal - travel | $1,227.02 | |

For example, on or about June 18, 2014, co-conspirator A delivered $3,200 to the defendant so that he could conduct a "trial run" aimed at discerning whether firearms and other material could successfully be smuggled from the United States to West Africa. On about August 11, 2014, co-conspirator A remitted about $51,400 to the defendant in support of the coup.

The defendant traveled to The Gambia on about October 28, 2014 as the advance party to prepare for the coup. These preparations included arranging lodging for conspirators, and conducting reconnaissance for the coup plan.

Execution

Once the conspirators were all in The Gambia, they began to implement their plan. Although the group initially planned to ambush the President of The Gambia during his over-land travels around the end of December, the group's plans changed when they

found out President Jammeh was going to leave the country on December 26, 2014. Instead, the group decided to attack the State House after his departure.

On the night of the assault, the conspirators were split in two teams, a five-member "Alpha" Team and a three-member "Bravo" Team. Both Teams met in the woods about a half-mile from the State House. There, they changed into their assault gear and put their other belongings into the rented cars they were going to use in the assault. The group expected that while the two teams took control of the State House, a battalion of Gambian soldiers sympathetic to the conspirators would arrive and offer support.

When the group arrived at the State House, they found that it had been fortified with additional soldiers. According to their plan, Alpha Team fired a shot into the air, hoping the soldiers would give up. Instead, the group began taking heavy fire from the guard towers. Alpha Team attempted to breach the door of the State House. The defendant believes some members of the Alpha Team members were killed.

Bravo Team lost radio communications with Alpha Team and decided to retreat. "Sarr," a member of Bravo Team, attempted to drive a car into the State House door. During the assault, the defendant remained in a safe house with other members of the conspiracy. The defendant's job was to escort co-conspirator A to the State House after the successful coup. co-conspirator A would then serve as interim leader of The Gambia. When the plan failed, the defendant fled The Gambia to the United Kingdom before ultimately returning the United States on or about January 29, 2015.

### C. Other Relevant Conduct of Defendant Barrow

Defendant Barrow utilized his training and experience acquired through his service in the United States military to provide professional guidance to the operational planning for the coup. With two other co-conspirators not charged herein, both of whom also possessed professional military experience, defendant Barrow produced military assessments, operational plans, and resource estimates. These tools helped the members of the conspiracy (1) refine the plans; (2) develop a budget to allow for the purchase weapons and other equipment, subsistence allowances, travel, and logistical support in The Gambia; and (3) "war game" the tactical operations to provide the best chance for success. An example of this military strategy defendant Barrow and his co-conspirators produced is located at Attachment 1. (*See* Attachment 1, Military Strategy For Operation Gambian Freedom (River Gambia).

## III. SENTENCING GUIDELINES

### A. The Sentencing Guideline Calculations Agreed to by the Parties

The parties agreed to the following Guideline calculations in the plea agreement:

**Count 1**
Base Offense Level, U.S.S.G. § 2A1.4(a)(2)(B):                            22

Multiple count instruction, U.S.S.G. § 2A1.4(b)(1):                       +3

**Count 2**
Base Offense Level, U.S.S.G. § 2X1.1/§ 2K2.1(c)(1)(B):                    25

Acceptance of responsibility, U.S.S.G. § 3E1.1(a), (b):                   -3

The parties agree that Barrow has a criminal history category of I, and the government's guideline calculation results in a total offense level of 22 and a resulting range of imprisonment of 41 – 51 months.

**B.    The PSR's Calculations and Recommendations**

On or about April 26, 2016, the United States Probation Office (USPO) disclosed the PSR in this case. The PSR calculates defendant's applicable guideline range at 46-57 months' imprisonment, based on a total offense level of 23 and a criminal history category of I. (PSR ¶ 109).

The PSR guideline calculations are as follows:

| | | |
|---|---|---|
| Base Offense Level (Count 1): | 0 | (PSR ¶ 50) |
| Base Offense Level (Count 2), U.S.S.G. § 2K2.1(a)(7): | 12 | (PSR ¶ 51) |
| Specific Offense Characteristics: | | |
|     More than 25 firearms, U.S.S.G. § 2K2.1(b)(1)(C): | +6 | (PSR ¶ 52) |
|     Obliterated serial numbers, U.S.S.G. § 2K2.1(b)(4)(B): | +4 | (PSR ¶ 53) |
|     Firearms used to commit felony, U.S.S.G § 2K2.1(b)(6): | +4 | (PSR ¶ 54) |
| Acceptance of Responsibility, § 3E1.1(a), (b): | -3 | (PSR ¶¶ 61-62) |
| Total Offense Level: | 23 | (PSR ¶ 63) |
| Criminal History Category: | I | (PSR ¶ 69) |
| Guideline Range: | 46-57 months | (PSR ¶ 109) |
| Supervised Release: | 1-3 years | (PSR ¶ 114) |
| Fine: | $10,000-$100,000 | (PSR ¶ 120) |

The PSR also indicates that the information provided does not constitute a recommendation by the USPO for a departure or a variance.

### C.     The Government's Response to the PSR

The government has no objections to the PSR, except as to the Offense Level Computation contained therein. First, and as described more fully below, the government believes U.S.S.G. § 2A1.4 should be applied by the Court when determining the appropriate guidelines offense level for violation of Count One (18 U.S.C. §§ 371 and 960). The government recognizes that the Sentencing Commission has not provided a specific guideline for this offense and understands the USPO's conclusion that no base offense level should be applied. Nevertheless, the government believes that an offense level of 25 is warranted here and appropriately describes the reckless conduct of these defendants during the attempted coup.[2] Further, in the government's view, the application of a Base Offense Level of 0, as proposed by the PSR, offers little instruction to the Court in crafting an appropriate sentence.

Second, as to the appropriate guidelines calculation for a violation of Count Two (18 U.S.C. § 924(o)), the government does believe the calculations as set forth in the draft presentence investigation report may be technically correct – specifically, the application of the specific offense characteristic for involving firearms with obliterated serial numbers in the offense (U.S.S.G. § 2K2.1(b)(4)(B)), which results in an adjusted

---

[2] There is evidence the co-conspirators' original plans targeted the Gambian president personally; however, the execution of the coup did not occur until he had left the State House, and indeed the country. The decision of the conspirators to delay their attack until the president had departed suggests the conspirators had abandoned their plans to target him.

offense level of 26. However, even though the application of this specific offense characteristic is correct, the government stands by the guidelines calculations agreed to by the parties in their plea agreement. This commitment is justified for many reasons, including the fact that on May 11, 2015, when this defendant entered his plea of guilty pursuant to the agreement, the United States Attorney's Office had no information that any firearm involved in this matter had an obliterated or obscured serial number. However, a short while later, FBI agents returned from The Gambia with photographs of the weapons recovered by Gambian officials. These photographs demonstrate some firearms no longer had visible serial numbers.[3] Moreover, as described below, the government believes that a 41-month sentence, coupled with a fine, is the appropriate sentence in this case.

## VI. A 41-MONTH SENTENCE IS APPROPRIATE UNDER 18 U.S.C. § 3553(a)

In *Gall v. United States*, 552 U.S. 38 (2007), the Supreme Court set forth the appropriate sentencing methodology: the district court calculates the advisory Guidelines range and, after hearing from the parties, considers the 18 U.S.C. § 3553(a) factors to determine a sentence sufficient, but no greater than necessary, to achieve the goals of 18 U.S.C. § 3553. 552 U.S. at 49-50; *United States v. Ruvalcava-Perez*, 561 F.3d 883, 886 (8th Cir. 2009) ("In sentencing a defendant, the district court should first determine the appropriate Guidelines range, then evaluate whether a traditional departure is warranted,

---

[3] Although defendant Barrow purchased firearms to support the coup, all of the weapons he purchased - and that were later recovered by Gambian authorities - had visible serial numbers at the time they were inspected by the FBI.

and finally decide whether or not to impose a guideline sentence after considering all the § 3553(a) sentencing factors.").

The district court may not assume that the Guidelines range is reasonable, but instead "must make an individualized assessment based on the facts presented." *Id.* at 50. If the Court determines that a sentence outside of the Guidelines is called for, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* Section 3553(a) requires the Court to analyze a number of factors, including, "the nature and circumstances of the offense," "the history and characteristics of the defendant," "the need for the sentence to reflect the seriousness of the offense," "the need for deterrence," "the need to protect the public from further crimes of the defendant," and "the need to avoid unwarranted disparities." 18 U.S.C. § 3553(a).

### A. Relevant History and Characteristics of the Defendant

As described above, although the defendant used the knowledge, skills, and abilities he acquired in the Tennessee Army National Guard (the "Guard") to assist in the planning of the coup, the Court should know that his service was otherwise commendable. The defendant enlisted in the Guard in April 2001 as a food service specialist and mobilized domestically for several months to support Operation Enduring Freedom. By 2005, defendant Barrow had been promoted to Sergeant and accepted into a three-year, full-time Army National Guard and Reserve Program – essentially making the defendant a full-time soldier in the Guard responsible for recruiting individuals into

the Guard and retaining those who might otherwise choose to depart. In 2008, he was promoted again to Staff Sergeant.

Later that year, the defendant earned his commission and was promoted into the Guard as Second Lieutenant in the Adjutant General's Corps. Two years later, in May 2010, he was promoted to First Lieutenant; two years later, he was promoted to Captain. His service as a commissioned officer was mostly spent as a public affairs officer. In January 2014, the defendant received an Honorable Discharge from the Guard.

### B. This Prosecution Is Neither an Indictment Nor Defense of The Gambia

The crimes of the defendant did not occur in a vacuum, but rather were motivated by a fervent desire to overthrow a regime he believed to be inhumane and oppressive. Indeed, all the defendants have justified their crimes by asking others to consider the purported nobility of their goal: regime change in The Gambia. The Court will surely hear these defendants and their supporters vociferously decry the human rights record of the government of The Gambia. They will provide persuasive evidence in this regard. Indeed, the United States government has long been critical of the human rights record of The Gambia. The U.S. Department of State's 2015 Country Report on Human Rights Practices in The Gambia outlines a practice of "torture, arbitrary arrest, prolonged pretrial and incommunicado detention; enforced disappearance of citizens; and government harassment and abuse of its critics." The Report also noted that Gambian officials "routinely used various methods of intimidation to retain power." In February 2014, the U.S. Department of State condemned anti-LGBT statements by President Jammeh, calling on the Government of The Gambia "to protect the human rights of all Gambians,

and we encourage the international community to send a clear signal that statements of this nature have no place in the public dialogue and are unacceptable."

However, the prosecution and sentencing of this defendant is not a defense of the regime in The Gambia, or its practices. The prosecution of this defendant is not an indictment of his previous lawful, peaceful efforts to advocate for regime change in The Gambia. The defendant enjoys broad freedoms in the United States to advocate, assemble, and vote for matters about which he cares deeply. However, the defendant does not have the freedom to join a private army, to help acquire an arsenal and smuggle it from the United States to The Gambia, or to devise the plans used by this private army to engage in the armed and likely bloody overthrow of a foreign government.

### C. The Defendant's Actions Imperiled Relations Between Nations

According to the United States Department of State, the coup attempt "interfered with U.S. foreign policy toward The Gambia and endangered U.S. interests." (*See* Attachment 2, Declaration of Principal Deputy Assistant Secretary David Wharton (the "Wharton Declaration")). Establishing and maintaining relationships between the United States and other nation states – whether allies or rivals – are the province of the United States government, not of private citizens. When the nature of the relationship involves the application of violence against another nation state, as is the case here, the risks and the stakes – and therefore the government's interests – are higher still.

Here, the defendant is a United States citizen who was a member of a conspiracy that recruited "soldiers" from across the United States, Germany, and elsewhere to join in an attempt to make foreign policy privately. He was also part of a conspiracy that

involved the purchase of weapons from across the United States: Minnesota, Texas, Tennessee, Kentucky, and Georgia. Barrow purchased firearms himself and unlawfully smuggled these firearms from the United States to The Gambia so that these "soldiers" could take up arms against The Gambia. (See Attachment 3, Photographs of Firearms Taken by FBI in Banjul, The Gambia). In so doing, he interfered with the United States government's foreign policy prerogative by launching a private violent attack on a foreign government.

The United States cannot allow her citizens to travel the globe perpetrating acts of violence against foreign governments. Generally, we in the United States would rightly expect that a foreign citizen who conspired to launch a violent assault in our country in order to overthrow our government would receive a lengthy sentence. Moreover, we would also attempt to hold accountable the nation state that provided the venue from which an assault was launched. The same expectation should apply here; our citizens should be held accountable for the destruction and terror they caused in Banjul on December 30, 2014.

Further, it should be of no consequence whether a country attacked by a private army from our shores is a close ally or not. Unauthorized attacks by United States citizens against foreign governments, no matter how well-intentioned, subject the United States to broad political consequences, including the very real possibility of retaliation both against U.S. citizens in The Gambia and on U.S. soil. In fact, the risk of retaliation against the United States is higher when the attack is launched against a rival country. It is for these reasons that the coup was denounced from the outset by the United States

Department of State, "We strongly condemn any attempt to seize power through extra-constitutional means." (*See* Exhibit 1 to Attachment 2, the Wharton Declaration).

### D.    The Defendant's Actions Imperiled Others

The assault on the State House by the defendant and his co-conspirators armed with assault rifles was doomed to fail, but also reckless in the extreme. The resulting deaths of three of the defendant's co-conspirators represent a tragedy that cannot be unwound. Wives lost husbands and children lost fathers on a dusty street in Banjul, The Gambia, far away from home.

However, providence prevented further loss of life. Shots were fired rather indiscriminately at and by those attacking the State House; fortuitously, no innocent bystanders lost their lives in the crossfire. The photographs taken of a vehicle used by the attackers provide some evidence of the volume of gunfire that was let loose on the night of December 30. (*See* Attachment 4, Vehicle Photographs Taken by FBI Agents in Banjul, The Gambia on May 5, 2015). The United States also feared for the safety of U.S. citizens following the attempted coup. Emergency messages were issued by the United States Embassies in The Gambia and Senegal to warn U.S. citizens to avoid Banjul. (*See* Exhibits 3 and 4 to Attachment 2, the Wharton Declaration). Unlike the unfortunate three who were killed, the innocent bystanders and U.S. citizens uninvolved in the plot did not assume the same dangerous risks these co-conspirators did when they attacked the State House. But they were subjected to similar risk of death nonetheless.

Finally, immediately after the failed coup on December 30, 2014, the government of The Gambia began rounding up dozens of individuals it suspected to be involved in

the plot. According to the United Nations Special Rapporteur on Torture, "at least 52 people have been detained, most by men in civilian clothing thought to work for the state intelligence agency. Several were released between February and May [2015], and it is unclear how many remain in incommunicado detention." (*See* Attachment 5, Amnesty International Article published May 27, 2015). To be clear, to the extent any of these individuals suffered abuse at the hands of authorities of The Gambia, the responsibility for that abuse lies solely with those same authorities; however, it also must be said that the defendants set in motion a series of events that made these abuses eminently foreseeable.

### E. Subjective Motives Do Not Make Good Foreign Policy

The defendant suggests that his motives for seeking regime change were noble and that his (intended) ends, ending oppression, justified his means, the application of unlawful violence. In the government's view, the defendant's subjective motives – however pure or honorable they be in his mind – do not justify his criminal activities. Every would-be revolutionary believes in the righteousness of his or her cause. Further, the consequences of such "noble" action can be dangerous and far-reaching. One can only imagine the consequences if a group of "well-intentioned" U.S. citizens attempted to overthrow a powerful rival to the United States. Finally, *even if* the United States generally agreed with the defendant's criticisms of the Gambian regime and his subjective motives for his crimes, the positions espoused by future coup plotters may not be at all in line with the policies and/or values of the United States, and the government

cannot, and should not, endorse any efforts to effect one's subjective beliefs, whatever they may be, by the violent overthrow of a foreign government.

### F. The Court's Sentence Should Promote Both Individual and General Deterrence

Given the nature of the offenses and the defendant's motive to commit the offense, there is a need for both individualized and general deterrence. Individualized deterrence is that which discourages a defendant from ever committing such a crime again. Here, the Court should consider the defendant's willingness to sacrifice years of his time, his expenditure of significant effort in planning the coup and the follow-on government, his willing investment of a small fortune to resource the coup, and his willingness to put his and others' lives at risk, when fashioning a sentence that might deter this defendant from re-engaging in a further scheme against The Gambia. Indeed, the fact that the defendant was willing to lose his life in this effort suggests individual deterrence will not come inexpensively. The Court's sentence should be sufficiently severe so as to deter this defendant from re-engaging in a second scheme. In the government's view, this should include both a 41-month custodial sentence as well as a financial penalty.

General deterrence is the public response necessary to deter other people from committing similar crimes. "Congress specifically made general deterrence an appropriate consideration . . ., and we have described it as 'one of the key purposes of sentencing.'" *Ferguson v. United States*, 623 F.3d 627, 632 (8th Cir. 2010) (quoting *United States v. Medearis*, 451 F.3d 918, 920 (8th Cir. 2006)). The State and District of Minnesota has a recent and troubled history of young men leaving the United States to

engage in violence overseas. While the motives of this defendant and his co-conspirators are very different from those traveling from Minnesota to Somalia and Syria to engage in violence, the Court should craft a sentence in this case that will attempt to dissuade any United States citizen from traveling abroad to commit acts of violence to further their own deeply held political or ideological beliefs.

Dated: April 29, 2016

Respectfully Submitted,

ANDREW M. LUGER
United States Attorney

*/s/ Charles J. Kovats, Jr.*

CHARLES J. KOVATS, JR.
Assistant United States Attorney

*/s/ Richard S. Scott*

RICHARD S. SCOTT
Trial Attorney
U.S. Department of Justice